IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROMONA MATHEWS
    *Plaintiff*,

   v.

CHOPTANK COMMUNITY
HEALTH SYSTEM, INC.,
    *Defendant*.

Civil No. ELH-20-1255

**MEMORANDUM OPINION**

In this employment case, Romona ("Mona") Mathews filed suit against her former employer, Choptank Community Health System, Inc. ("Choptank" or "CCHS"), alleging that she was wrongfully terminated in retaliation for reporting inadequate patient care and for requesting medical leave. In particular, she asserts claims under the Maryland Health Care Worker Whistleblower Protection Act ("Whistleblower Act" or "HCWWPA"), Md. Code (2014 Repl. Vol.), §§ 1-501 to 1-506 of the Health Occupations Article ("H.O.") (Count 1); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* (Count 2); and the Maryland Healthy Working Families Act ("MHWFA"), Md. Code (2016 Repl. Vol., 2020 Supp.), §§ 3-1301 to 3-1311 of the Labor and Employment Article ("L.E.") (Count 3).   ECF 34 ("Third Amended Complaint" or "TAC").[1]

Choptank has filed a post-discovery motion for summary judgment (ECF 42), supported by a memorandum of law (ECF 42-2) (collectively, the "Motion") and numerous exhibits. ECF

---

[1] Plaintiff originally filed suit in the Circuit Court for Caroline County. ECF 1 ("Notice of Removal"). However, after plaintiff added the FMLA claim in her TAC, defendant removed the case to federal court on the basis of federal question jurisdiction and supplemental jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1367. *Id.*

42-3 to ECF 42-17. Plaintiff opposes the Motion (ECF 51, the "Opposition") and has submitted several exhibits. ECF 51-1 to ECF 51-10. Defendant replied (ECF 52) and filed two additional exhibits.  ECF 52-1; ECF 52-2.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

### I.    Factual and Procedural Background[2]

### A.    Procedural Background

Plaintiff filed suit against Choptank in the Circuit Court for Caroline County on June 4, 2019, alleging a violation of Maryland's Whistleblower Act.  *Id.*  Then, on July 9, 2019, prior to service of the suit on Choptank, plaintiff filed an Amended Complaint, adding a claim for retaliation, in violation of the Maryland Fair Employment Practices Act ("Fair Employment"), Md. Code (2014 Repl. Vol.), §§ 20-601 *et seq.* of the State Government Article.  ECF 11 ("FAC").

---

[2] The Factual Background is derived from the exhibits submitted by the parties, including deposition transcripts for Mathews and her supervisor, Janette Bowling. Both parties submitted different portions of the deposition transcripts. Portions of Bowling's transcripts are docketed at ECF 42-7, ECF 51-2, and ECF 52-1. I shall refer to them collectively as "Bowling Tr."  The Mathews transcripts are docketed at ECF 42-3, ECF 51-1, and ECF 52-2. I shall refer to them collectively as "Mathews Tr."

I shall generally cite to the pagination as it appears on the court's electronic filing system. This does not always correspond to the page number on the submission. And, for the deposition transcripts, I shall include the page number and line of the transcript, as relevant.

As discussed, *infra*, the facts are viewed in the light most favorable to the non-moving party.  *See Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) (noting that summary judgment is only appropriate if the Court finds no genuine dispute of material fact after "viewing the evidence in the light most favorable to the non-moving party").

- 2 -

Thereafter, on August 22, 2019, plaintiff filed a Second Amended Complaint. ECF 16 ("SAC").
In the SAC, plaintiff removed the Fair Employment claim. *Id.*

Defendant moved to dismiss the SAC. ECF 17.  But, the court denied defendant's motion.
ECF 20. Discovery proceeded on the SAC, concluding on May 7, 2020. ECF 35.

On May 8, 2020, following the completion of discovery, plaintiff filed her Third Amended
Complaint. ECF 34.  In the TAC, plaintiff added two claims: violation of the FMLA (Count 2) and
violation of the Maryland Healthy Working Families Act (Count 3).  On May 20, 2020, on the
basis of plaintiff's newly added FMLA claim, defendants removed the case to this Court. ECF 1.

### B.      Factual Background

### 1.      Employment with Choptank

Choptank is a private non-profit community health center that provides primary health care
services in seven facilities throughout the Eastern Shore of Maryland. ECF 51-2 at 5, Bowling Tr.
at 13:18-20.  From 2005 until her termination on June 12, 2018, Mathews worked as a medical
assistant ("MA") for Choptank. She primarily worked out of Choptank's Easton Pediatrics
("Easton Peds") facility. *Id.* at 12, Bowling Tr. at 177:11-13.

Mathews was first certified as a medical assistant in 1979 after taking a course and passing
an exam. ECF 42-3 at 4, Mathews Tr. at 11:7-15. The certification lasted for a two-year period and
then she "let the certification go." *Id.* at 4-5, Mathews Tr. at 11:18-12:11. When Mathews was
hired by Choptank in 2005, she was not required to renew her certification. *Id.* at 5, Mathews Tr.
at 12:7-18.  Throughout her career with Choptank, Mathews received positive performance

reviews that consistently ranked her as meeting or exceeding expectations. *See* ECF 51-4 (performance reviews from 2006 to 2015).

From around January 2018 until June 2018, Mathews was supervised by the Director of Clinical Operations ("Director"), Jannette Bowling. ECF 51-2 at 3, Bowling Tr. at 5:17, 7:17. Bowling began working for Choptank in December 2017. *Id.* at 4, Bowling Tr. at 5:17. Her role as Director included managing "35-plus" employees, including medical assistants, like Mathews, and registered nurses. *Id.*, Bowling Tr. at 8:2-7. Bowling was also involved in staff scheduling, the vaccine program, the daily routine of the different sites, and ordering supplies. *Id.* at 6, Bowling Tr. at 15:16-16:2.

In addition, Bowling had the power to hire and fire employees "jointly" with human resources. *Id.* at 4, Bowling Tr. at 8:13-21. Bowling testified that she generally did not have to consult with anybody before terminating an employee, but she chose to consult with her supervisor, Gary Long, the Chief Financial Officer, and Rick Barton, director of human resources. *Id.* at 5-6, Bowling Tr. at 9:11-10:23.

Bowling testified that she never "had any complaints or issues with" Mathews before the "interactions g[o]t bad." *Id.* at 8, Bowling Tr. at 23:21-24:10. In fact, in February 2018, Bowling had two MA applicants "shadow" Mathews at work. *See* ECF 51-5 (Emails between Mathews and Bowling, February 2018). And, Bowling asked Mathews for her feedback on the applicants. *Id.* Further, Mathews offered to assist Bowling with staffing shortages on at least one occasion in March 2018. *See* ECF 51-6 (Emails between Mathews and Bowling, March 2018).

## 2.      Reporting

As a Director, Bowling held monthly meetings with employees, known as "rounding" sessions.  ECF 34, ¶ 7; ECF 51-1 at 15, Mathews Tr. at 229:4-14. Mathews testified that during the rounding session between Mathews and Bowling in March 2018, she told Bowling that the thermometers at her facility were not providing accurate information.  ECF 51-1 at 11, Mathews Tr. at 151-152. Mathews described a specific incident where an 8-month old child had a fever of 102 degrees according to the mercury rectal temperature, but the regular thermometer reading came back normal. *Id.* Mathews also testified that she told Bowling that the majority of blood pressure cuffs at the Easton facility were old or outdated and did not provide an accurate blood pressure reading. *Id.* at 13, Mathews Tr. at 158:15-17.

Further, Mathews said that she talked to Bowling about the staffing practices in Choptank's Denton office. *Id.* at 12, Mathews Tr. at 156-157. In particular, Mathews testified that she complained to Bowling that "frequently" the Denton office "had only one MA scheduled to work simultaneously with two providers." *Id.*, Mathews Tr. at 157:2-5. And, Mathews stated that on at least one occasion she was required to work for two providers at once. *Id.*, Mathews Tr. at 157:11-17.

In contrast, Bowling testified that during the March 2018 session Mathews only informed her that the thermometers were not working properly, but she did not mention anything about an 8-month old child, blood pressure cuffs, any other defective equipment, or inadequate staffing practices. ECF 51-2 at 11, Bowling Tr. at 170-171.

- 5 -

Mathews testified that Bowling's "behavior" towards Mathews changed after their rounding session in March 2018. ECF 51-1 at 13, Mathews Tr. at 159:14-17. In particular, Mathews explained that Bowling no longer made eye contact with her, ignored her, and communicated with her through co-workers. *Id.*, Mathews Tr. at 159-160. Further, Mathews testified that she believed Bowling did not want to speak to her based on "a lot of [Bowling's] actions." *Id.* at 14, Mathews Tr. at 162:20-163:8. Mathews said: "[Bowling] would never address the concern that I had. She would short talk me. She...was always evasive and I never got an answer for any of the concerns that I had." *Id.*, Mathews Tr. at 162:20-163:8. In addition, Mathews stated: "I frequently traveled to all the different sites. I would walk in and I would see her and she would see me and there was no greetings, I always had to greet her. She acted like she didn't see me." *Id.*, Mathews Tr. at 163:4-8.

As a result of the March 2018 rounding session, Mathews claimed that Bowling refused to hold a rounding session with her in April 2018. *Id.*, Mathews Tr. at 163:12-14. However, Bowling testified that she did not recall refusing to hold a session with Mathews. ECF 51-2 at 11-12, Bowling Tr. at 173:21-174:3.

Thereafter, in May 2018 Mathews attended a rounding session with Bowling and Long. *Id.* at 12, Bowling Tr. at 175; ECF 51-1 at 12, Mathews Tr. at 156:16-18. Bowling testified that Long participated in the rounding session because he "was very in tune with the staff, and he wanted to round with us, and it was something that he did with the other directors also...So anyone that I was able to round with that month, he was present." ECF 51-2 at 12, Bowling Tr. at 175-176. However, Bowling did not recall what they discussed during this session. *Id.*, Bowling Tr. at

176:13-177:10. According to Mathews, during this rounding session, she complained about all the same issues that she had mentioned during the March 2018 session with Bowling. ECF 51-1 at 13, Mathews Tr. at 159:3-7.

At plaintiff's deposition, she was asked to identify the law, rule, or regulation that she believed Choptank had violated with the ineffective equipment and staffing shortages. ECF 42-14 (Pl.'s Response to Choptank's Second Set of Interrogatories); ECF 42-3 at 18-19, Mathews Tr. at 176-177. Mathews testified, ECF 42-3 at 19-20, Mathews Tr. at 177:4-178:17:

> Q: What activity did Choptank engage in that was in violation of a law, rule or regulation?
> …
> A: I believe the safety act, with not having effective equipment.
> Q: Safety act. What is that?
> …
> A: The safety for the patients.
> Q: Well, you said safety act.
> A: I'm sorry. The safety of the patients.
> Q: So is this some written act or rule?
> A: Well, when you have ineffective equipment we can't provide quality care.
> Q: That's not what I'm asking. Is it a written rule somewhere?
> …
> A: Oh, I'm not sure.
> Q: Okay. And I think that answers the rest of this sentence. It says that it was in violation of a law, rule, or regulation.
> A: Okay
> Q: What law, rule, or regulation did Choptank violate?
> …
> A: Safety
> Q: Is it a law?
> A: It says here that it's a violation of a law, rule, or regulation.
> Q: It doesn't identify. I'm asking you to tell me what the law is, what the rule is, what the regulation is.
> …
> Q: All I'm hearing from you is that it's the safety of the patients, but this says it was a specific law, rule, or regulation and I'm asking you to point me to the law, rule, or regulation.
> A: I can't point you to that.

In May 2018, Bowling exchanged emails with other Choptank staff about the problems with the thermometers for "Easton Peds." *See* ECF 51-8. For example, on May 25, 2018, Rachel Spellman, another Choptank employee, wrote in an email to Bowling: "It seems that our temporal thermometers have not been working for a while here at Easton Peds…Ramona [Mathews] informed me this morning that she got a reading of 98.9 on a 2 year old on all 4 thermometers and then Dr. Faber had her get a rectal temp which was 102. I have also had a number of parents report higher temperatures at home than what we're getting here…." ECF 51-8 at 5. And, in an email of May 29, 2018, Bowling told another Choptank employee, Brett Meyers, to order new thermometers, "[i]f they have not bee[n] ordered." *Id.* at 6.

### 3.    Leave Requests

According to Bowling, from January 2018 until June 12, 2018, Mathews filed twenty-one requests for Paid Annual Leave ("PAL"). ECF 42-4 ("Termination Notice") at 2. Eighteen of those requests were approved and three were denied. *Id.* As noted, Bowling was in charge of approving PAL requests for medical assistants, including Mathews' requests. ECF 51-2 at 9, Bowling Tr. at 56:2-7.

Choptank's Employee Handbook sets out Choptank's policy on PAL and requesting leave. ECF 42-5 (the "Handbook"). The Handbook provides: "Time off requests for PAL should be requested at least two weeks in advance primarily to ensure that staff coverage is available. A Time Off Request Form must be completed and approved by the staff member's immediate supervisor." *Id.* at 6.

- 8 -

Further, the Handbook includes procedures for requesting leave under the FMLA. It states,

ECF 42-5 at 9-10:

> You generally are required to provide advance notice and medical certification.
> Family and medical leave may be denied if these requirements are not met:
>
> - You must provide 30 days advance written notice when the leave is
>   foreseeable. Otherwise, notice must be given as soon as practicable.
>
> - Medical certification must be provided to support a request for leave
>   because of your or a family member's serious health condition, and second
>   or third opinions (at the Company's expense) may be required….Failure to
>   provide medical certification within the required time frames may result in
>   your termination of FMLA leave.

Defendant's "Human Resources Policies & Procedures Manual" elaborates on the process

for requesting leave. ECF 42-6 (the "Manual"). The Manual states, *id.* at 10:

> CCHS provides paid time off for eligible regular employees who are regularly
> scheduled to work 20 or more hours per week. To ensure adequate staff coverage,
> time off should be scheduled and approved in advance by the appropriate
> department head.
>
> Time off requests for vacation, personal days and other planned absences should be
> requested at least two weeks in advance primarily to ensure that coverage is
> available. A time off request must be completed and approved by the staff
> member's immediate supervisor and/or the CEO.
>
> All employees scheduling of time off is done at the discretion of CCHS
> Management. Management will attempt to schedule time off with the voluntary
> cooperation of the employees involved. However, some requests for days off may
> not be approved due to the needs of the facility or number of requests submitted.

According to Bowling, a Choptank employee is allowed to take PAL for "[a]ny reason why

they needed a day off. Maybe they needed to go to the doctor, or they just wanted a day off. We

never questioned why people needed to use their PAL. They earned it, and we try to accommodate

them to use it." ECF 51-2 at 9, Bowling Tr. at 54:21-55:4.  However,  as noted in the Manual,

- 9 -

some requests for leave could not be "approved due to the needs of the facility or number of requests submitted." ECF 42-6 at 10.  Further, Bowling said: "On multiple occasions, it has been explained to Mona that while every attempt is made to accommodate PAL requests, there will be incidents where a request cannot be granted based on operational needs." ECF 42-4 at 2.

On February 26, 2018, Mathews submitted a PAL request for March 12, 2018. ECF 42-4. According to Bowling, the request came in when the "March schedule had already been completed." *Id.* at 2.  Bowling denied the request as a result of a shortage of medical assistants on that date. *Id.* According to Bowling, "[u]pon learning of the PAL denial, Mona informed [Bowling] that she still wouldn't be there that day…stating 'I don't know what *you* are going to do, but *I* have an appointment.'" *Id.* (emphasis in original). Ultimately, Mathews' request was approved because "another MA cancelled their PAL request" for the same date.  *Id.*

On April 11, 2018, Bowling "received a request from Mona advising that she needed to leave early ***the next day***, due to a death in her family to attend the funeral." *Id.* (emphasis in original). Plaintiff's request was denied because of "lack of alternate MA coverage, and the fact that Mona had agreed to cover for another MA that day." *Id.*  Plaintiff responded by email to the denial of her request, stating: "OK." *Id.* According to Bowling, Mathews subsequently "asked whether alternate coverage could be found for her based on what appeared to [her] to be available staff." *Id.* In response, Bowling "reaffirmed that no alternate MA coverage was available and reminded [Mathews] that she was already covering for another MA" on that day. *Id.*  Bowling recounted that, on the evening of April 11, 2018, plaintiff left two messages on Bowling's home

answering machine "stating that the funeral arrangements have been changed (time and location) and that she would be leaving [work] at 10:15 to attend the services." *Id.* (emphasis in original).

In response to Mathews' voicemails, on the morning of April 12, 2018, Bowling said that she "called Mona and informed her that she could leave at 10:15AM to go to the [funeral] service, but she needed to be back by 12:00 noon to cover for the other MA." *Id.* According to Bowling, Mathews said she would "try to get back as soon as she can." *Id.* Bowling claimed that, "[a]fter several rounds of explaining [to Mathews], the need for her to be back by 12:00, and her dismissively informing [Bowling] that she 'may or may not be back at 12:00,' [Bowling] informed her, that if she was not back by 12:00, this would be considered unscheduled leave." *Id.*

Plaintiff clocked out at 10:18 a.m. on April 12, 2018, and clocked back in at 12:35 p.m. *Id.* Further, Mathews was scheduled to work until 4:30 p.m., but clocked out at 2:11 p.m. that day, without notifying Bowling. *Id.*

Then, on April 20, 2018, plaintiff submitted leave requests for Friday, June 8, 2018 and Monday, June 11, 2018. ECF 42-3 at 14, Mathews Tr. at 166:4-6. On May 31, 2018, Mathews' request for leave on June 8, 2018, was approved but the leave request for June 11, 2018, was denied. ECF 42-15 (Choptank Online Leave Request Page); ECF 42-4 at 2; ECF 42-3 at 8, Mathews Tr. at 73:7-21. According to Bowling, on June 7, 2018, another employee informed Bowling that Mathews said she was not coming to work on June 11, 2018. ECF 42-4 at 2. As a

- 11 -

result, Bowling called Mathews "to clarify that the PAL request was denied and that she was expected to report to work" on June 11. *Id.*; ECF 42-7 at 8, Bowling Tr. at 122:4-7.[3]

Bowling recalled that she discussed several things during that phone call with Mathews: "That I'm clarifying that she was reporting to work on Monday, reminding her that her request had been denied because I didn't have coverage, and I was making sure she was showing up because I needed her to work." ECF 42-7 at 8-9, Bowling Tr. at 122:21-123:5. According to Bowling, Mathews' response to Bowling "was a flippant 'we'll see.'" *Id.*; *see also id.* at 9, Bowling Tr. at 123:8-15. And, Bowling claimed that she was surprised by Mathews' response, so she said "excuse me?" and Mathews again said "we'll see." ECF 42-4 at 2; *see also* ECF 42-7 at 9, Bowling Tr. at 123:11-18.

According to Mathews, Bowling took her words out of context and "exaggerated."  ECF 51-1 at 5, Mathews Tr. at 74:21-75:1.  Mathews recalled that the phone call with Bowling took place while she was on the way to the hospital with her husband for his "bilateral hernia surgery." *Id.*, Mathews Tr. at 75:3-9. Mathews told Bowling that she was on route to the hospital for the surgery and said "we'd have to see what happened with his surgery." *Id.*, Mathews Tr. at 75:6-9. Specifically, Mathews alleged that she said to Bowling: "[W]e'll see how everything happens with my husband and the surgery." *Id.*, Mathews Tr. at 75:19-20.  According to Mathews, she was

---

[3] Bowling did not recall whether this phone call took place on June 7 or June 8, 2018.  *See* ECF 51-2 at 10, Bowling Tr. at 143:14-19.  But, Mathews testified that it took place on June 8, 2018. *See* ECF 34, ¶ 18; ECF 51-1 at 5, Mathews Tr. at 74-75. The discrepancy is not material.

"nervous and very concerned" about whether her husband "would make it through the surgery okay" because he had another surgery five months earlier. *Id.,* Mathews Tr. at 75:10-16.

In contrast, Bowling testified that during this phone call Mathews never discussed her spouse, his health condition, or that she was on her way to the hospital. ECF 51-2 at 5, Bowling Tr. at 11. And, on Monday, June 11, 2018, Mathews called Bowling at 5:50 a.m. and stated: "I'll use a sick day today." ECF 42-7 at 13, Bowling Tr. at 155:12; *see also* ECF 51-1 at 5, Mathews Tr. at 76:5-7.

Although Mathews did not say anything about her husband's health condition in relation to her leave requests for June 2018, it is undisputed that, as of at least February 12, 2018, Bowling knew that Mathews' husband had a health condition. ECF 51-7 (Email from Mathews to Bowling, dated Feb. 12, 2018); ECF 51-2 at 10, Bowling Tr. at 144:11-145:1. In an email to Bowling dated February 12, 2018, Mathews said: "Thanks for asking about my husband…he is fair." ECF 51-7 at 2. During her deposition, Bowling testified that she did not know what was wrong with Mathews' husband when she sent that email in February, but she "assume[d] he must not have been feeling well" based on something Mathews said, so she asked "[h]ow he was feeling." ECF 52-1 at 7, Bowling Tr. at 137.

### 4.    Termination

As indicated, Mathews was terminated on June 12, 2018. She testified that she walked into a meeting with Bowling and Rick Barton on that date and Bowling told her that this would be her last day at Choptank. ECF 51-1 at 6, Mathews Tr. at 81. Mathews testified that she was "unclear" as to why she was terminated. *Id.* at 7, Mathews Tr. at 84:16-18; *see also id.* at 9, Mathews Tr. at

116:16-19. And, she claimed that she never received any paperwork during that meeting. *Id.* at 8, Mathews Tr. at 88:5-15.

The Termination Notice (ECF 42-4; ECF 51-3), signed by Bowling, reviewed the conversations surrounding plaintiff's leave requests for March 12, 2018, April 12, 2018, and June 8 and 11, 2018. *Id.* at 2.[4] The Termination Notice stated: "In less than four months, there have been three incidences related to PAL request denials in which Mona demonstrated behaviors that violate with CCHS's Standards of Behavior. In each of these incidents, Mona's communication with her Supervisor was demanding and non-collaborative and her actions related to denied PAL requests were detrimental to the team environment and interfere with CCHS's ability to effectively provide care to the patients we serve." *Id.*

On the Termination Notice, Bowling checked three boxes under "Type of Offense:" "Absenteeism;" "Rudeness Customers/Coworkers;" and "Insubordination." *Id.* at 3. And, under "Standard Violations," Bowling checked: "Commitment to Service;" "Respect;" "Professionalism;" "Teamwork;" "Listening & Responding;" "Integrity;" and "Patient Focus." *Id.*

At Bowling's deposition, she testified that Mathews "was terminated due to insubordination." ECF 51-2 at 7, Bowling Tr. at 18:1-2. Further, Bowling stated that Mathews "wasn't meeting the standards of behavior that we all exhibited working for Choptank, which

---

[4] Both parties submitted slightly different versions of the Termination Notice. *See* ECF 42-4; ECF 51-3. The typed text is the same in both versions, but plaintiff's version (ECF 51-3) is signed by Bowling as "Supervisor." And, it contains a handwritten note underneath the signature. *Id.* at 3. Defendant's version (ECF 42-4), in contrast, is not signed. Nonetheless, the parties do not dispute that Bowling drafted the Termination Notice.

included, you know, patient focus, teamwork, things like that. Commitment to service. We have standards of behaviors that we have to follow." *Id.*, Bowling Tr. at 18:4-9. And, Bowling explained that the other reasons she terminated Mathews included: "Respect, accountability, patient focus, because our patients were number one. And there was a few more standards that she did not meet up to." *Id.*, Bowling Tr. at 18:18-21.

Prior to terminating Mathews, Bowling explained that she consulted with both Barton and Long. *Id.*, Bowling Tr. at 19:2-12. However, Bowling never looked at Mathews' personnel file, including Mathews' prior performance reviews. *Id.*, Bowling Tr. at 20. Nor did Bowling know how long Mathews had worked for Choptank. *Id.* at 11, Bowling Tr. at 171. In other words, Bowling claimed that she "based [her decision to terminate Mathews] on [her] interactions and the situations with [Mathews]." *Id.* at 7, Bowling Tr. at 20-21.

Bowling testified that she thought her interactions with Mathews "were good" until a certain point. *Id.,* Bowling Tr. at 21:2. In fact, Bowling explained that she never "had any complaints or issues with" Mathews before "the time [she] had to deny PAL time." *Id.* at 8, Bowling Tr. at 23:21-24:10. However, Bowling explained that her interactions with Mathews began to "get bad" when she had to deny Mathews' PAL requests. *Id.* at 7, Bowling Tr. at 21.

In particular, Bowling testified: "[T]here was a time that I had to deny a [PAL] day because we were short MAs, and we had to make sure our providers had MAs that they needed in order to do patient care. And [Mathews] wasn't happy with being denied her PAL time, and it was her tone and her attitude, and comments that she would make, like, 'I don't know what you're going to do

but I won't be there. I have an appointment,' or something. And that was just unprofessional, and, to me, it was insubordination." *Id.* at 8, Bowling Tr. at 22:9-19.

Bowling did not recall the exact date of her first problematic interaction, but she knew that "it was the first time that [she] had to deny" one of Mathews' leave requests.  *Id.*, Bowling Tr. at 24. Further, Bowling noted: "There were other instances [of challenging interactions with Mathews], but that was the first that I can recall." *Id.*

On July 11, 2018, after Mathews was terminated, she filed a complaint with the Maryland Department of Labor, Licensing and Regulation ("DLLR" or the "Commission"). ECF 42-8 ("DLLR Complaint"). In her DLLR Complaint, Mathews stated: "I believe this was discrimination retaliation because I requested leave time (for June 8th and June 11th 2018) 2 months in advance (on April 20th 2018) for my husband's upcoming scheduled surgery. My supervisor initially approved both request [sic] (on May 30th 2018). She later revised the schedule…and approved only one of these days (June 8th) and denied the other (June 11th). I then used a sick day in place of the day denied. When I returned to work on June 12th I was terminated." *Id.* at 6. On October 12, 2018, the DLLR issued a letter noting that it had "closed its file" on Mathews' claim. ECF 42-9 (DLLR Notice).

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 4, 2018. ECF 42-10 (the "EEOC Charge"). In the EEOC Charge, Mathews alleged: "I believe that I have been discriminated against due to my race (Black), with respect to discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended." *Id.* at 2.  The EEOC issued a Dismissal and Notice of Rights on March 27, 2019.  ECF 42-11.  It

said: "Based upon its investigation, the EEOC is unable to conclude that the information obtained

establishes violations of the statutes. This does not certify that the respondent is in compliance

with the statutes. No finding is made as to any other issues that might be construed as having been

raised by this charge." *Id.* at 2.

This suit followed on June 4, 2019. ECF 9.

## II.      Standard of Review

Defendant has moved for summary judgment under Fed. R. Civ. P. 56.  Rule 56(a)

provides, in part: "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found.

v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if,

viewing the evidence in the light most favorable to the non-moving party, the case presents no

genuine issues of material fact and the moving party demonstrates entitlement to judgment as a

matter of law.").  The nonmoving party must demonstrate that there are disputes of material fact

so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion.  "By

its very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect

the outcome of the suit under the governing law." *Id.* at 248.  There is a genuine issue as to material

fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817

F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 522 (4th Cir. 2003) (alteration in *Bouchat*) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*,

541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  Moreover, in resolving a summary

judgment motion, a court must view all of the facts, including reasonable inferences to be drawn

from them, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. Ltd.*,

475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United*

*States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720

F.3d 169, 173 (4th Cir. 2013).  However, summary judgment is appropriate if the evidence "is so

one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252.  And, "the

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208,

216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make

credibility determinations.  *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

## III.    Discussion

Defendant alleges that it is entitled to summary judgment on all three counts of the TAC. First, defendant argues that plaintiff was not covered by the HCWWPA, but even if she were, she did not disclose any unlawful activity subject to protection under the act. ECF 42-2 at 7-8. Second, defendant asserts that plaintiff did not satisfy the notice requirements necessary to allege a retaliation claim under the FMLA. *Id.* at 20. Finally, Choptank contends that Mathews' claim under the Maryland Healthy Working Families Act fails because the act does not provide for a private cause of action. *Id.* at 25-26.

### A.  Maryland Health Care Worker Whistleblower Protection Act (Count 1)

Plaintiff alleges that she was terminated in violation of the Maryland Health Care Worker Whistleblower Protection Act, H.O. §§ 1-501 to 1-506.  ECF 34 at 4.  The HCWWPA provides, H.O. § 1-502:

> [A]n employer may not take or refuse to take any personnel action as reprisal against an employee because the employee:

- 19 -

(1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation;

(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by the employer; or

(3) Objects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation.

The protections provided under the Whistleblower Act only apply if, *id.* § 1-503:

(1) The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation;

(2) The employer's activity, policy, or practice that is the subject of the employee's disclosure poses a substantial and specific danger to the public health or safety; and

(3) Before reporting to the board:

(i) The employee has reported the activity, policy, or practice to a supervisor or administrator of the employer in writing and afforded the employer a reasonable opportunity to correct the activity, policy, or practice; or

(ii) If the employer has a corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation, the employee has followed the plan.

"Employee" is defined as "any individual licensed or certified by a board under this article [i.e., the Health Occupations Article] who performs services for and under the control and direction of an employer for wages or other remuneration." *Id.* § 1–501(c)(1); *see also Parks v. Alpharma, Inc.*, 421 Md. 59, 80, 25 A.3d 200, 212 (2011) (noting the act "specifically protected 'licensed and certified' healthcare employees that reported violations…") (citing *Lark v. Montgomery Hospice*, 414 Md. 215, 229-30, 994 A.2d 968, 976-77 (2010)).

According to defendant, plaintiff was not an "employee" under the HCWWPA's definition of employee because she was not a licensed medical assistant during her employment with Choptank.  ECF 42-2 at 7.  Moreover, medical assistants are not protected under the statute.  *Id.* at 7-8.

To my knowledge, no court has interpreted the definition of an employee under this statute. The Fourth Circuit has said that, in interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court."  *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007).

Maryland "follows the general principles of statutory interpretation."  *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).  "'The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature.'"  *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (quoting *Wagner v. State*, 445 Md. 404, 417, 128 A.3d 1, 9 (2015)); *accord Bourgeois v. Live Nation Entm't, Inc.*, 430 Md. 14, 26, 59 A.3d 509, 516 (2013); *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010).

To that end, the Maryland Court of Appeals follows a two-step approach.  *Johnson,* 430 Md. at 377–78, 61 A.3d at 38:

> First, if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end.  Second, when the meaning of the plain language is ambiguous or unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.

(Internal citations and quotation marks omitted); *see Brutus 630, LLC v. Town of Bel Air*, 448 Md. 355, 367–68, 139 A.3d 957, 964 (2016); *Bourgeois*, 430 Md. at 27, 59 A.3d at 516; *Miller v. Mathias*, 428 Md. 419, 451, 52 A.3d 53, 72 (2012).

The Health Occupations Article pertains to licensing and board certifications for twenty-one types of medical professionals, including, *inter alia*, chiropractors, dentists, nutritionists, and nurses. But, it does not provide licensing or certification rules for medical assistants. In fact, medical assistants are not referenced in any section of the Article.

Maryland courts recognize the doctrine of *expressio unius est exclusio alterius*, which means "the expression of one thing is the exclusion of another." *See Griffin v. Lindsey*, 444 Md. 278, 288, 119 A.3d 753, 758 (2015); *see also Hudson v. Hous. Auth. of Balt. City*, 402 Md. 18, 30, 935 A.2d 395, 402 (2007) (observing that the doctrine is a "fundamental principle of construction, long recognized in Maryland"). Under this familiar interpretive canon, "statutory lists are often interpreted as exclusive, so that a court will draw the negative inference that no other items may be added." *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712, 37 A.3d 972, 978 (2012); *see Griffin*, 444 Md. at 288, 119 A.3d at 759 (discussing cases applying the canon); *see also N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017).

Under this interpretative canon, the absence of the profession of "medical assistants" from the 21 types of medical professionals in the Article suggests that its exclusion was "by deliberate choice, not inadvertence." *Bruesewitz v. Wyeth* LLC, 562 U.S. 223, 233 (2011) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)); *accord Griffin*, 444 Md. at 288, 119 A.3d at 758. The exclusion of medical assistants from the Article indicates that medical assistants are, in fact,

not considered to be "licensed or certified by a board under this article." And, it follows that a medical assistant, like Mathews, cannot qualify as an employee under the HCWWPA and is not covered by the act's protections.

Even if the HCWWPA did extend to medical assistants, plaintiff would fare no better. This is because she was neither licensed nor certified by a board at the relevant time. Moreover, even if a medical assistant qualified as an employee for the purposes of the HCWWPA, plaintiff has not provided evidence to support a finding that she is entitled to protection. As noted, under the HCWWPA, "[a]n employer may not take or refuse to take any personnel action as reprisal against an employee because the employee: (1) discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is *in violation of a law, rule, or regulation*." H.O. § 1-502 (emphasis added). Further, the protections provided under the statute apply only if, *id.* § 1-503: "The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation."

The parties dispute the correct interpretation of the statute. Plaintiff argues that she need only "have a reasonable good faith belief" that Choptank's behavior was unlawful, pursuant to § 1-503. ECF 51 at 8-9; ECF 42-14 at 3-4. And, defendant asserts that plaintiff misinterprets the statute because her interpretation "ignores the entirety of the…statutory scheme, and more specifically, § 1-502, which enumerates the 'protected activities,' which are covered." ECF 52 at 5. Thus, defendant argues, plaintiff is not protected under the act because she did not disclose a law, rule, or regulation that Choptank violated.

The Court need not determine the proper interpretation of the statute because plaintiff has failed to present sufficient evidence for a rational trier of fact to infer that she satisfied either provision. Mathews has not established that she disclosed a practice that was in violation of a law, pursuant to § 1-502, or that she had a "reasonable, good faith belief" that Choptank engaged in an activity that violated a law, pursuant to § 1-503.

Plaintiff's Whistleblower Act claim is based on alleged reporting of staff shortages, faulty thermometers, and defective blood pressure cuffs. In the TAC, plaintiff alleges that she had a "reasonable good faith belief that Choptank was in violation of laws, rules, or regulations pursuant to *inter alia* Title 19 of the Maryland Health Code, which governs Health Care Facilities in the State of Maryland." ECF 32, ¶ 24. Title 19 contains 23 subtitles and 232 sections, but plaintiff does not specify any particular section of the Maryland Code that she believed Choptank may have violated. The Maryland Code does not appear to state rules regarding staffing or equipment. Without more specificity from plaintiff, the Court cannot conclude that she reported practices that were in violation of a specific provision of the Maryland Code. *Cf. Parks*, 421 Md. at 86-87, 25 A.3d at 215-216 (dismissing plaintiff's claim for wrongful discharge because she was not sufficiently clear as to the specific law, rule, or regulation violated by defendant).

Moreover, as reviewed earlier, at her deposition plaintiff was unable to identify a specific section of Title 19 that she believed Choptank had violated, or any other law, rule or regulation that might have been violated. *See* ECF 42-3 at 19-20, Mathews Tr. at 177:4-178:17. When plaintiff was asked "to point . . . to the law, rule, or regulations," she responded: "I can't point you to that." *Id.* at 20, Mathews Tr. at 178:12-17.

- 24 -

Plaintiff maintains that her legal position is bolstered by the fact that other Choptank staff were also complaining about the same equipment, as evidenced by various emails between Choptank employees. ECF 51 at 10 (citing ECF 51-8). However, rather than demonstrating that defendant was engaged in non-compliant practices or retaliated against employees for reporting these issues, the emails actually show that Choptank was trying to address the issues as to both thermometers and blood pressure cuffs. *See generally* ECF 51-8. For instance, on May 30, 2018, after receiving several emails about problems with both types of equipment, Bowling placed an order for new thermometers and blood pressure cuffs. ECF 51-8 at 10.

To be sure, plaintiff may have had serious concerns about the efficacy of the equipment and understaffing, which may have led her to report those concerns to Bowling. However, it is clear from plaintiff's testimony that she did not have a specific law, rule, or regulation in mind when she reported these concerns to Bowling. And, concerns for safety, on their own, are not enough to gain the protections of the HCWWPA. In contrast with whistleblower acts from other jurisdictions, the HCWWPA specifically applies only to disclosure of policies, practices, or acts that are actually unlawful. *Compare* H.O. §§ 1-502, 1-503, *with* Cal. Health & Safety Code § 1278.5 (protecting employee that "has initiated, participated, or cooperated in an investigation…related to the quality of care, services, or conditions at the facility…").

Accordingly, because plaintiff is not considered an employee under the HCWWPA and has not made a report subject to the protections of the HCWWPA, I shall grant defendant's Motion as to Count 1 of the TAC.

**B. FMLA (Count 2)**

Under Count 2, plaintiff claims defendant violated the FMLA when it terminated her "after she requested medical leave to care for her spouse's serious health conditions."  ECF 34 at 5.

"The FMLA is intended 'to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons.'"  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 381 (4th Cir. 2001) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999)).  Under the FMLA, an "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for . . . a son, daughter, or parent, of the employee, if such . . . son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).[5]

A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  *Id.* § 2611(11).  "Continuing treatment" includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition."  29 C.F.R. § 825.115(c).   "A chronic serious health condition is one which: (1) Requires periodic visits . . . for treatment . . . ; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)."  *Id.*  In some

---

[5] An employee is eligible if the employee "has been employed . . . (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).  It is undisputed that Smith was an "eligible employee."

cases, absences "attributable to incapacity" due to a chronic serious health condition "qualify for FMLA leave even though . . . the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days.  For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack[.]" *Id.* § 825.115(f).

Under the FMLA, there are two types of claims: "(1) 'interference,' in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) 'retaliation,' in which the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Edusei v. Adventist Healthcare, Inc.*, DKC 13-0157, 2014 WL 3345051, at *5 (D. Md. July 7, 2014) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009)); *see also Fry v. Rand Construction Corporation*, 964 F.3d 239, 244 (4th Cir. 2020).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson*, 558 F.3d at 294-95; *see also Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013). Thus, courts have interpreted the FMLA to provide a cause of action for retaliation.  *Dotson*, 558 F.3d at 295.

An interference claim "'merely requires proof that the employer denied the employee his entitlements under the FMLA[.]'" *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). In contrast, retaliation requires "'proof of retaliatory intent.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *Stallings*, 447 F.3d at 1051); *see also Edusei*, 2014 WL 3345051, at *6. Plaintiff brings a retaliation claim against Choptank. ECF 34 at 5.

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial. Although the methods of proof pertain to trial, these two avenues inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas Corp*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*"); *see also Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

In the context of summary judgment, and with respect to the first method, "[t]o avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*, 257 F.3d at 391 (alteration in original).  "Direct evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).  "[D]irect evidence must demonstrate that an adverse employment action was actually 'due to . . . FMLA leave as opposed to some other lawful reason.'"  *Sharif*, 841 F.3d at 205 (quoting *Laing*, 703 F.3d at 718 n.1).

In the absence of direct or indirect evidence of discrimination, the focus shifts to the plaintiff's second avenue of proof—the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas.* The *McDonnell Douglas* proof scheme "is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  *See, e.g.*, *Young*, 575 U.S. at 212.

In this case, there is no direct evidence of discrimination.  Therefore, I turn to review the *McDonnell Douglas* proof scheme.

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

Under the *McDonnell Douglas* framework, the plaintiff has the burden of proving a prima facie case of retaliation by demonstrating that "'(1) [the plaintiff] engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events.'" *Fry*, 964 F.3d at 245 (quoting *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019)); *see also Evans v. International Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019); *Irani v. Palmetto Health*, 767 Fed. App'x 399, 421 (4th Cir. 2019) (per curiam); *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018); *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 233 (4th Cir. 2009); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko*, 446 F.3d at 551); *see also Fry*, 964 F.3d at 245.

Plaintiff must first establish that she engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse . . . action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998); *see* 42 U.S.C. § 2000e-3(a).

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added). The adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In other words, in a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

An action is adverse in the retaliation context if it might "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citations omitted); *see Hoyle*, 650 F.3d at 337. By analogy, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray v. International*

*Paper Co.*, 909 F.3d 661, 557 (4th Cir. 2018).   Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'"   *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).   Nor does "a personal conflict alone . . . constitute retaliation."   *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

To establish causation, the employee must prove that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer."   *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Irani*, 767 Fed. App'x at 421; *Foster v. Univ. of Md. – E. Shore*, 87 F.3d 243, 252 (4th Cir. 2015).   The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the firing was pretextual."   *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity."   *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original).   Pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection."   *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).   Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the

protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'"  *Id.* (citation omitted).  Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'"  *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation.  "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'"  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

If plaintiff  "'puts forth sufficient evidence to establish a prima facie case of retaliation'" and the employer "'offers a non-discriminatory explanation'" for the adverse action, plaintiff "'bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.'" *Yashenko*, 446 F.3d at 551 (quoting *Nichols*, 251 F.3d at 502).  To meet her burden, the plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered

reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 143; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Defendant argues that plaintiff does not satisfy the requirements for either the first or third elements of a retaliation claim. ECF 42-2 at 17. In particular, defendant contends that plaintiff did not engage in a protected activity under the FMLA because she did not provide "adequate and timely notice." *Id.* at 20.  Further, Choptank asserts that plaintiff's alleged protected activity was not the cause of her termination; "rather, her termination resulted from her insubordination with Ms. Bowling on several occasions." *Id.* at 23.

### 5.      Protected Activity: Notice

Judges in this district have relied on the first four elements of an interference claim to define "protected activity" for the purpose of a retaliation claim. *See, e.g., Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 481 (D. Md. 2015); *Edusei v. Adventist Healthcare, Inc.*, DKC-13-0157, 2014 WL 3345051, at *10 (D. Md. July 7, 2014) (citing *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 515-516 (D. Md. 2008)). That is, a plaintiff must demonstrate that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; and (4) she gave her employer adequate notice of her intention to take

leave." *Edusei*, 2014 WL 3345051, at *10. Defendant contends that plaintiff failed to satisfy the fourth element—the notice requirement. ECF 42-2 at 20-23.

 "An employee is mandated to provide notice to her employer when she requires FMLA leave." *Rhoads*, 257 F.3d at 382; *see Krenzke v. Alexandria Motor Cars, Inc.*, 289 Fed. App'x 629, 632 (4th Cir. 2008) ("The employee has the initial burden of triggering the FMLA by providing notice to her employer….to satisfy this initial burden, the employee need only inform her employer that she needs leave from work for a medical reason."); *Sherif*, 127 F. Supp. 3d at 477; *see* 29 C.F.R. § 825.302 (notice requirements for foreseeable FMLA leave); *id.* § 825.303 (notice requirements for unforeseeable FMLA leave). Courts have "held that a plaintiff did not engage in a protected activity because the plaintiff had provided insufficient notice of the need for FMLA-qualifying leave." *Sherif*, 127 F. Supp. 3d at 481-82 (citing *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012); *Wilson v. Noble Drilling Servs., Inc.*, 405 Fed. Appx. 909, 913 (5th Cir. 2010)).

Section 825.302 (a) of 29 C.F.R. provides (emphasis added):

> *An employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based* on an expected birth, placement for adoption or foster care, *planned medical treatment for a serious health condition of the employee or of a family member*, or the planned medical treatment for a serious injury or illness of a covered servicemember. If 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable.

Where the need for leave is unforeseeable, notice should be given "as soon as practicable under the facts and circumstances of the particular case," with an expectation that notice will occur "within no more than one or two working days of learning of the need for leave, except in

- 35 -

extraordinary circumstances where such notice is not feasible." *Id.* § 825.303(a).  "As soon as practicable means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." *Id.* § 825.302(b).

Notably, "if the required notice, whether 30 days or 'as soon as practicable,' is not given, the employer can deny leave even if the spouse does have a serious health condition." *Aubochon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951 (7th Cir. 2004) (citing *Collins v. NTN–Bower Corp.*, 272 F.3d 1006, 1008–09 (7th Cir. 2001) (noting that "notice is essential" even assuming that the employee was suffering from a serious health condition); *Bailey v. Amsted Industries Inc.*, 172 F.3d 1041, 1046 (8th Cir. 1999); *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)).

To request leave, an "employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. §§ 825.302(c), 825.303(b). If the leave is for a family member, such information may include "that the conditions renders the family member unable to perform daily activities; ... and the anticipated duration of the absence." *Id.*; *see Nicholson*, 690 F.3d at 826 (Where "the need for leave concerns a family member rather than the employee herself, the employee should also indicate that leave is sought to care for that person."); *Rodriguez*, 545 F. Supp. 2d at 522 ("[A]n employee must give[ ] some level of detail regarding the nature of the illness and the likely duration of the absence such that the employer is able to reasonably conclude that the absence may qualify as FMLA leave."). Of relevance here, "[w]hen an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c).

- 36 -

"In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave." *Id; see also Brushwood v. Wachovia Bank, N.A.*, 520 Fed. Appx. 154, 157 (4th Cir. 2013) (citing *Rhoads*, 257 F.3d at 382–83).

"Without further details of the specific nature of an employee's illness, however, information merely indicating that an employee is 'sick' is insufficient to put an employer on notice that FMLA leave may be needed." *Rodriguez*, 545 F. Supp. 2d at 518. Thus, for example, "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(b); *see Aubuchon*, 359 F.3d at 952 ("The requirement of notice is not satisfied by the employee's merely demanding leave. He must give the employer a reason to believe that he's entitled to it.") (citing *Collins v. NTN–Bower Corp.*, 272 F.3d at 1008; *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312–13 (7th Cir. 1998); *Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998)).

In sum, "'[w]hat is practicable [notice under the FMLA], both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case. The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Moore v. United Intern. Investigative Services, Inc.*, 209 F. Supp. 2d 611 (E.D. Va. 2002) (quoting *Manuel*

*v. Westlake Polymers, Corp.*, 66 F.3d 758 (5th Cir. 1995)); *see also Rodriguez*, 545 F. Supp. 2d at 518.

The employee must also "comply[] with [the] employer's policy" for requesting leave. 29 C.F.R. § 825.303(c); *see also id.* § 825.302(d) (providing that "an employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave"). For example, an employer may require employees "to call a designated number or a specific individual to request leave." 29 C.F.R. § 825.303(c). If "an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.* §§ 825.302(d), 825.303(c). Courts have held that an employee's failure to comply with her employer's internal leave policies and procedures is a sufficient ground for termination and forecloses an FMLA claim. *Gilliam v. United Parcel Service, Inc.*, 233 F.3d 969, 972 (7th Cir. 2000) (finding proper termination where employee failed to call in accordance with a collective bargaining agreement); *see also Righi v. SMC Corp.*, 632 F.3d 404, 411-12 (7th Cir. 2011).

Defendant argues that Mathews' notice regarding her absence on June 8 and June 11, 2018, was both inadequate and untimely under the FMLA notice requirement. ECF 42-2 at 20-23; ECF 52 at 11-13. And, in particular, defendant contends that plaintiff's "need for leave was foreseeable," so her notice to Bowling via phone call on June 8, 2018, was untimely. ECF 52 at 11-13. And, plaintiff's leave request on April 20, 2018, did not provide sufficient information to make Choptank aware that she was requesting time off for her husband's health condition. *Id.*

In response, plaintiff asserts that she provided adequate notice because "Bowling *knew* that Mathew's husband had a serious health condition as early as February 12, 2018." ECF 51 at 14 (emphasis in original) (citing ECF 51-7; ECF 51-2 at 10, Bowling Tr. at 144:11-145:1). In addition, Mathews notes that on June 8, 2018, she informed Bowling that she was on her way to the hospital for her husband's surgery on that day.  ECF 51 at 15. According to plaintiff, this "satisfies the spirit of the FMLA statute." *Id.*

In my view, plaintiff does not establish that she gave the required notice to Choptank to qualify for FMLA leave on June 8 or 11, 2018. To start, it is undisputed that plaintiff's need for FMLA leave for both dates in June was foreseeable. In the TAC, Mathews asserts that the "leave request [on April 20, 2018 for June 8 and 11, 2018] was made to permit Mathews to take her husband to the doctor for a surgical procedure concerning his serious health care condition." ECF 34 at 3. Therefore, as of at least April 20, 2018, plaintiff knew that her husband had a serious health condition and would need treatment that would require her to take leave from work.

Because plaintiff's need for leave was foreseeable, pursuant to 29 C.F.R. § 825.302(a), she was required to provide notice by May 9 and 12, 2018—30 days before June 8 and 11, 2018—in order to qualify for FMLA leave for those two days. And, her notice at that time had to include enough information so as to put Choptank on notice that FMLA leave may be needed.

However, the evidence does not demonstrate that plaintiff established adequate notice by either of those dates in May. On April 20, 2018, Mathews requested leave for June 8 and 11, 2018. ECF 42-3 at 8, Mathews Tr. at 73:7-17; *id.* at 14, Mathews Tr. at 166:4-6. Therefore, her request was timely. But, it did not provide any information about the reason for which plaintiff needed

time off. And, of particular relevance, she did not mention her husband's surgery or his health condition.

To be sure, Mathews need not have "expressly assert[ed] rights under the FMLA or even mention[ed] the FMLA." *Shoemaker v. Alcon Labs, Inc.*, 741 Fed. App'x 929, 932 (4th Cir. 2018) (internal citations omitted). But, she still had to "provide sufficient information for [Choptank] to reasonably determine whether the FMLA may apply to the leave request." *Id.* As a matter of law, it was insufficient under the FMLA for Mathews simply to have cleared her request for time off through the proper internal procedures. *See Aubuchon*, 359 F.3d at 952 ("The requirement of notice is not satisfied by the employee's merely demanding leave. He must give the employer a reason to believe that he's entitled to it."); *see also, e.g., Adams v. Wallenstein*, 814 F. Supp. 2d 516, 525-26 (D. Md. 2011) (finding employee did not establish that he made a request for FMLA leave because there was no indication that he "hinted to" employer "that he was taking time off because of an FMLA-related condition"); *Fischer v. NYC Dep't of Educ.*, 666 F. Supp. 2d 309, 318 (E.D.N.Y. 2009) (finding employee's request for leave did not place employer on notice of request for time off for serious medical condition and consequently did not constitute protected activity underlying retaliation claim); *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007) (finding that employee did not provide notice by simply calling in sick and providing vague doctor's note, thereby defeating employee's retaliation claim).

Moreover, the extent to which Bowling was aware of Mathews' husband's health condition is immaterial because there is no evidence that Mathews informed Bowling or anyone else at Choptank—with the exception of the June 8 phone call, discussed *infra*—that she had to take time

off to care for her husband. Therefore, even if Bowling was aware of plaintiff's husband's medical condition, plaintiff cannot satisfy the FMLA notice requirement without additional evidence that she connected her request for leave with her husband's condition. *See Shoemaker*, 741 Fed. App'x at 932 (finding that even though employer was aware of plaintiff's medical condition, because she never asked to take leave due to her medical condition, she did not engage in a protected activity under FMLA); *see also Nicholson*, 690 F.3d at 826-28 (even though employee informed employer of parents' serious medical diagnosis, she did not communicate that she needed time off to care for them, so court found conversations were too indefinite to put employer on notice for purpose of alleging FMLA retaliation claim); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (Even assuming that employer had sufficient notice that employee suffered from diabetes as chronic health condition, employee's statement to employer that he had to leave work early due to problem with his insulin pump was insufficient to inform employer that his absence was FMLA-qualifying; for all employer knew, "problem" could be of mechanical or minor nature.); *Gilliam v. United Parcel. Serv.*, No. 3:98CV0442RM, 1999 WL 1705510, at *5 (N.D. Ind. Oct. 13, 1999) (Even though plaintiff's employer knew that employee's fiancée was pregnant, that could not constitute "verbal notice sufficient to make [employer] aware of the need for FMLA qualifying leave, the timing of the leave, or the duration of the leave as required by the regulations."), *aff'd*, *Gilliam,* 233 F.3d at 971.

And, because Mathews never provided adequate information with her leave request, Choptank's duty to inquire further into plaintiff's need for FMLA leave was never triggered. *See Rodriguez*, 646 F. Supp. 2d at 519 (Concluding that "an employer's duty of further inquiry is not

triggered unless the employer, under the circumstances could 'reasonably be expected to conclude [the plaintiff's] absence might have qualified for treatment under the FMLA.'") (alterations in *Rodriguez*) (internal citation omitted).

In addition, as mentioned, plaintiff claims that she satisfied the notice requirement during her phone call with Bowling on June 8, 2018, when she informed Bowling that she was on her way to the hospital for her husband's surgery on that same date. ECF 51 at 15. However, even if plaintiff provided enough information during this phone call to satisfy the informational element of the notice requirement, the call was not sufficiently far in advance as to satisfy the timing element. This is because it was not 30 days in advance, or even "as soon as practicable." *See, e.g, Gilliam*, 233 F.3d at 971 (noting "the FMLA does not provide for leave on short notice when longer notice readily could have been given").

Finally, as indicated, Choptank has a written policy requiring an employee requesting FMLA leave to provide 30 days' advance notice and medical certification. ECF 42-5 at 9. But, Mathews did not provide medical certification for her husband's medical condition or 30 days advance notice. To be sure, an employer cannot deny FMLA leave when an employee has a legal entitlement to it. *See Righi*, 632 F.3d at 412. But, Mathews' failure to follow the applicable regulatory and workplace requirements for notifying her employer of the reason for her requested leave precludes any legal entitlement.

In sum, plaintiff simply has not presented any evidence for a rational trier of fact to conclude that Choptank was on notice of her need for FMLA qualifying leave. Because an employee's failure to comply with the regulatory and workplace requirements for notice forecloses

an FMLA claim, I conclude that plaintiff failed to establish a prima facie case of retaliatory

discharge. *See Shoemaker*, 741 Fed. App'x at 933 (Employee "never engaged in protected activity

and thus failed to make a prima facie showing of retaliation."); *Rodriguez*, 545 F. Supp. 2d at 522-

23 (holding an employee's FMLA notice inadequate and summary judgment in favor of the

employer appropriate where employee provided "no basis either to conclude that the illness might

be a serious health condition or to forecast how long she would be out of work) (citing *Peeples v.*

*Coastal Office Products, Inc.*, 203 F. Supp. 2d 432 (D. Md. 2002)). Accordingly, Choptank is

entitled to summary judgment with respect to Count 2.

### C.      Maryland Healthy Working Families Act (Count 3)

Under Count 3, plaintiff alleges that Choptank violated the Maryland Healthy Working

Families Act, L.E. §§ 3-1301 to 3-1311. ECF 34 at 5. Defendant argues that because the DLLR

never issued an order finding that Choptank violated the MHWFA, plaintiff cannot maintain a

private cause of action under the act. ECF 42-2 at 25-26. Plaintiff counters that the "Commission

failed to provide Mathews with an order," which means it "failed to abide by the statute" and

violated the "Accardi doctrine." ECF 51 at 18; *see United States ex rel. Accardi v. Shaugnessy*,

347 U.S. 260, 268 (1954).

Under the MHWFA, Maryland employers with 15 or more employees are required to

provide "an employee with earned sick and safe leave that is paid at the same wage rate as the

employee normally earns." L.E. §§ 3-1302, 3-1304. The leave "shall accrue at a rate of at least 1

hour for every 30 hours an employee works." *Id.* § 3-1304(b).  But, an employer "may not be

required to allow an employee…to earn more than 40 hours of earned sick and safe leave in a year." *Id.* § 3-1304(c).

In addition to the sick leave requirement, the MHWFA sets out an enforcement scheme that includes the potential imposition of treble damage penalties for statutory violations. Employees can file complaints with the DLLR alleging violations of the MHWFA. *Id.* § 3-1308. L.E. § 3-1308 provides: "If an employee believes that an employer has violated this subtitle, the employee may file a written complaint with the Commissioner [of the DLLR]…the Commissioner shall conduct an investigation and attempt to resolve the issue informally through mediation…If the Commissioner is unable to resolve an issue through mediation…and the Commissioner determines that an employer has violated this subtitle, the Commissioner shall issue an order." Further, it provides: "Within 30 days after the Commission issues an order, an employer shall comply with the order…If an employer does not comply with an order within the time period stated…within 3 years after the date of the order, an employee may bring a civil action to enforce the order in the county where the employer is located." *Id.* § 3-1308(c).

As indicated, on July 11, 2018, plaintiff filed a complaint with the DLLR. ECF 42-8. And, on October 12, 2018, the DLLR "closed its file" as to Mathews' claim. ECF 42-9. Therefore, plaintiff is correct to note that the DLLR did not issue an order.  But, that does not mean that the "Commission failed to abide by the statute."  ECF 51 at 18.

As defendant points out, plaintiff does not cite any "authority which requires the DLLR to issue such an order." ECF 52 at 15.  By the plain language of the text of the statute, the DLLR is only required to issue an order if "the Commissioner is unable to resolve an issue through

mediation…and the Commissioner determines that an employer has violated this subtitle." L.E. § 3-1308.

Plaintiff has provided no evidence to indicate that the Commissioner was unable to resolve the issue or that the Commissioner determined that Choptank violated the MHWFA. Therefore, defendant is entitled to judgment as a matter of law with respect to Count 3.

### IV.    Conclusion

For the reasons stated above, I shall grant defendant's Motion (ECF 42).  An Order follows.


Date:   December 28, 2020                                     _____/s/_____
                                                                               Ellen L. Hollander
                                                                               United States District Judge

- 45 -